Mr. Parrish In this case, it's unchallenged on appeal that Andre had sustained a significant permanent injury, that being the loss of heart tissue due to the delay in treatment aboard the NCL vessel, the failure to provide thrombolytics or do anything other than palliative care, where he went from a Killip 1 to a Killip 4, subsequently had surgery to have a defibrillator pacemaker installed. So, under this court's authority, in Davis v. Walmart and Nebula Glass v. Reichhold, which we brought to the attention of the District Court, we believe that the District Court erred in granting a directed verdict. We also have raised the Daubert issue, which chronologically preceded the directed verdict issue, of course, but we're going to address the directed verdict issue first. To me, the directed verdict issue becomes a lot easier once you resolve the Daubert issue. I mean, if the District Court is right about the exclusion of the expert testimony, you've got a lot less to rely on to support lost earning capacity. And it seems to me that your expert, Dr. Anderson's assumption that your client did not have career opportunities more lucrative than working as a part-time university teacher or a member of a corporate board is entirely speculative. It's one thing to say, I couldn't return to my former job as a CEO working 40 hours or more a week and saying that that necessarily means that I could only work 10 hours a week in these other capacities. It seems to me there's nothing really to support the expert's assumption about that. It's entirely speculative. Well, obviously, we disagree, Your Honor. In fact, his assumptions are based upon testimony of Andre's physicians, both Dr. Mahano, who was the retained expert, and also Dr. Ramper said that he could not work a full-time job. I get all that. They said he couldn't do his former job. What they didn't say is what he could do. I mean, the only thing you have to rely upon is that the expert says, well, I talked to your client, and this is what he wants to do. That doesn't mean that that's all he could do. It's a big difference between 10 hours a week and 40 hours a week. That is what economists do in corporate rooms throughout this country every day. They interview the plaintiffs. They get information about what the plaintiff's medical condition is, and then they crunch numbers. Why wouldn't the expert necessarily have concluded that he could work 20 hours a week in those capacities in a lower-stress environment like being a university teacher or a member of a corporate board? Why would it only be 10 hours a week? Well, there was no specific number given. Andre testified he thought he could take on maybe two more board jobs, and he could teach. But the problem is that the assumption that the expert makes about what the difference is is an assumption based on the 10 hours a week, isn't it? It was not based on a specific number of hours. It was based on the types of jobs that Andre thought that he could obtain in his community, which is obviously not the United States but Trinidad and Tobago. And it seems, Your Honor, this is a back-and-forth way of saying that we needed to have a book rehab expert, which the case law does not support. We do not have to show that— I'm not saying—there might be one way of proving it, but the problem is it just doesn't seem to me, other than speculation, that you had any way of proving it. Well, first of all, Your Honor, under the facts of this case, the jury knew that Mr. Avalon made $135,000 before and was making $8,000 now. If the jury had awarded $127,000 a year for 20 years, this court would have needed to affirm that because that's what the evidence would have shown was his prior earning capacity and his current earnings. He's trying to—he could have taken a position— Because there's a difference between current earnings and current earning capacity. That's the problem. Correct. And we didn't sit with just current earnings. We said—Andre said, I think I can also work on a few—maybe another board or two, and I could teach part-time. He didn't—he looked around. He didn't have any other abilities. In fact, in order to get a permanent job, he would have had to have gotten clearance from a physician, which the evidence shows he would never have been able to get. We presented the testimony of his former employer and said there's no way that he could be rehired in that job because you have to work long hours under stressful conditions. There's never been a requirement that you have to show to a jury a specific job that you could obtain and that they have to have that information. That's not one of the requirements under Florida law or maritime law, and not that there's a big distinction at all between the two areas of law. Counsel, you agree that the burden is on the plaintiff to show current earning capacity, post-accident, post-tort earning capacity, correct? No, Your Honor, I don't. The duty on us is to show that there's been a diminution. He doesn't have to show the—well, we know what his earning capacity was before. I say we know. You have a better argument of that, although the fact that he had to quit because his previous job that generated that earning capacity was too stressful. But putting that to the side, you agree that if you can't show the post-heart attack, K-4, earning capacity, you lose, right? We have to provide a reasonable basis to the jury to make a determination on what that is. That's true. You have to have evidence from which the jury can find by preponderance that that's his present post-tort earning capacity, right? But it doesn't have to be specific. You can't skip ahead to the but. Just tell me whether you disagree. Suppose there had been a stipulation. We agree his pre-tort earning capacity was X dollars. The plaintiff does not know and cannot prove what his post-tort earning capacity is. Now, Judge, you decide the issue, or you decide whether the jury's got enough. You would lose, would you not, under that extreme hypothetical, and please don't tell me that's not the facts of the case. That's why we call it a hypothetical, okay? If you can't prove what his post-tort earning capacity is, you lose. We only have to be able to give the jury a reasonable amount of information for the jury to make a determination. So that's not the question I'm asking. If you can't prove his post-tort earning capacity, by whatever standard of proof is imposed and is appropriate, you lose. The burden's on you, correct? Obviously, it is our burden to establish what the determination is. Which is why Judge Pryor's original question is relevant, which is that if you lose the Daubert issue, you lose this case, correct? No, Your Honor. I do not believe that's the case. Okay, let's put the expert out, as the district court did. All right, then we have the evidence that follows all of the factors that the case law says you look at. We have the pre-injury earning capacity. We have the post-injury earnings of what he is making right now, which is $8,000. Yeah, but that's not capacity. The distinction between earnings and earning capacity is what hurts you. Yes. But, Your Honor, we also have testimony from physicians that he cannot work a full-time job. We have testimony about his health. He can't work the old 60-hour-a-week job. Sure. Okay? That's true. What can he do? They don't testify to that. Well, he testifies that he's very, very tired. He feels like he's at about 20% capacity from where he was before. He faints when he stands up sometimes. He's on a number of medications. And he has looked into what he believes he can possibly get hired for on his island, not, you know, in New York City or Miami. He tests at maybe 10 hours a week. The 20% would be? 10 to 15. Well, so the jury can take that. The doctors talk about a 30% ejection fraction. He talks about the fact that he thinks he's got about 20% of the energy he used to have. You look at the health, the habits, the occupation, the surroundings, the prior earnings and subsequent earnings. Those are the types of things that this court said to look at in Davis v. Walmart and in Nebula. We say you don't have to have a precise formula. Okay. You saved five minutes for rebuttal, Mr. Ryder. Let me know if I pronounced that incorrectly. You did. Thank you, Your Honor. May it please the court. Jack Ryder on behalf of NCL. Let me start by turning to counsel's, the appellant's initial brief and argument on appeal. And after about four minutes, I have a record issue with you. So you say in your gray brief that you properly preserved an issue for appeal about the directed verdict. You point out that your client moved for judgment as a matter of law at the close of the evidence because you say plaintiff failed to meet his burden of proof tied to the standard of care. But I looked at the pages, the page of the record that you cite and all the pages before and afterward, and I don't see where that was the argument that you made for a directed verdict. It seems to me, particularly on the page that you cite, your argument was a causation argument. You said, I don't believe the plaintiff has met their burden of proving that either the failure to give thrombolytics and or the specifics with regard to the disembarkation in a causal connection would have led to a different result than ultimately what happened in the record. That's a causation argument. And you're making a completely different argument, it seems to me, on appeal. Your Honor, let me be clear. We are not arguing on appeal. This is correct. It is a different argument on appeal. The argument on appeal, you're referring to the procedural history of the case, I believe. I'm referring to the page of the record that you cited in your brief to support the proposition that you properly preserve this issue for appeal. Yes, Your Honor. Let me make sure that I'm being clear on this. We did move for judgment as a matter of law, but as with respect specifically to the standard of care, we are moving for a new trial, not a judgment as a matter of law. And if there's any, if that was not 100% clear in the brief, I apologize for that. But the point that we make here is not that this is not our argument on cross appeal. This is an argument that the evidence was insufficient to support the jury's verdict. Yes, Your Honor. Which is not the argument you made below. Your Honor, I believe, Ben, there may be a miscite to the record, but Your Honor, there was an argument specifically as to the standard, not in terms of the standard of care. You didn't make an argument below, as far as I can tell, that the evidence was insufficient. Your Honor, again, we may have... About the standard of care. Yes, Your Honor. Let me make sure I'm answering the court's question. We specifically did argue for judgment as a matter of law, based on the fact that the evidence taken in its entirety did not demonstrate that there would have been a different outcome, but for... That's a causation argument. Yes, Your Honor. And so I want to make sure that I'm clear. That was a causation argument. That is not our appellate argument. Right. So you didn't preserve your appellate argument. Well, our argument for appeal, Your Honor, is not about a judgment as a matter of law. Ours is about a new trial. And I think it's pretty... I think it's well settled, Your Honor, that if there's no specific argument for judgment as a matter of law, the court can still examine it in the context of a new trial. Your opponent said, though, that when you raised that issue about a motion for a new trial, you didn't properly preserve the issue. And you said, well, we moved for judgment as a matter of law on this causation issue and cited the page about the causation argument. That's my point. Your Honor, to the extent that there was anything about that that appears inaccurate, I apologize for that. I want to make sure... See, here's the problem. It matters because our law says, here's what happens. If an issue goes to the jury without first objecting to the sufficiency of the evidence, our review on appeal is limited to inquiring into whether any evidence supported submission of the issue. That's the Cogar decision. That's a tough burden for you. Your Honor, I understand. And again, we are not arguing that the court erred by not entering judgment as a matter of law under the standard of care analysis. Our argument is that the judge abused discretion by allowing the plaintiff's experts to testify in a manner that was inconsistent with the appropriate maritime standard, which is well preserved. And we are arguing that the court should have instructed the jury in accordance with this court's decision in Franza as it pertains specifically to... You said a new trial is necessary because O'Boolen did not establish the requisite standard of care applicable to a physician facing a cardiac emergency at sea, or then prove that NCL's doctors did not meet the applicable standard of care. That's a sufficiency argument. Exactly, Your Honor, but it goes, well, it goes to the question of the instruction, Your Honor, it goes to two issues. And let me, I disagree that it's a sufficiency issue, Your Honor, for two reasons. Number one, the question, and certainly, you know, this is with respect to our cross appeal, certainly, Your Honor, on the question of whether or not plaintiff's experts provided an appropriate testimony as it relates to the standard of care. The question is, what is the applicable standard? And that dovetails specifically into the jury instruction. So our argument... I know where you had it, alternate jury instruction. To me, the difference between the two was trivial and far, and fell clearly within the discretion of the district court to give the pattern instruction that didn't have the specific language about the circumstances being at sea versus on land. That's jury argument kind of stuff. I understand that you preserved an issue about the jury instruction, although it doesn't seem to have much merit to me. But, you know, my focus has been on this issue about the motion for a new trial, which is not dependent on the jury instruction. It's a sufficiency argument, best I can tell. Your Honor, that I respectfully submit was preserved because there was early on in the case, there was argument about the issue of the jury instruction, and the jury instruction issue is what helped define the concept of, and Your Honor refers to it as And it was the jury instruction that helped frame the issues of what Your Honor refers to as sufficiency of evidence, and I respectfully submit is the standard of care. And yes, Your Honor, and the standard of care here, specifically the issue of the standard of care, as this court described in Franza, necessarily is variable depending upon when comparing physicians on board a ship medical center as opposed to land-based medical center. And so, Your Honor, our argument is not for judgment as a matter of law, based upon the failure to apply the appropriate standard of care. Our argument is for a new trial, because we respectfully submit that if the court is going to instruct the jury, I understand Your Honor referred to that as a trivial difference, and I would submit that that's an extraordinarily significant difference, Your Honor. In Franza, this court talked about the fact that implicit within the variable standard is the notion that cruise lines will not be held to the same standard of care that would guide treatment on shore, and why that matters and why I believe that the lack of clarity on the existence of what is the appropriate standard of care applicable to doctors on a cruise line is fundamentally vital to how the entire trial would progress. What was, counsel, what was put before the jury about which witnesses that there should be a different standard of care on board? What was the jury, how was the jury to know? This is not a negligent standard. This is a whoops, super duper negligent standard. I mean, what exactly was the jury to apply because it happened at sea? What standard? I believe, Your Honor, the standard that should have been applied is to explicitly identify for the jury that the standard or the what was provided by trial counsel and that is, is that when examining the conduct of the physicians on board the vessel, they should be compared to conduct that is of that similarly situated maritime or admiralty circumstances. And that's what the, I mean, do you think the jury didn't realize that this happened on board? Absolutely. The judge told him all the circumstances. Of course. Your Honor, the jury, the jury, of course, knew that this happened on board the ship, but all one has to do, I would submit, is look at the expert testimony of the plaintiffs, who as they describe the standard of care, describe it in the context of an emergency room setting, repeatedly. Your client offered testimony that the facilities on board the ship were at least the equivalent of a land-based emergency room, didn't he? Absolutely, Your Honor, because they are, they are, but they're state of the art, but they also identified the existence of certain limitations inherent within a medical center on board a vessel. And the judge instructed the jury that medical negligence, it had to be defined in light of all the relevant surrounding circumstances and that medical negligence is doing something that a reasonably careful physician would not do under like circumstances or failing to do something that a reasonably careful physician would do under like circumstances. So it's up to you to argue to the jury that it made a difference that this was at sea versus on land based on whatever evidence that you're talking about. The only difference that you're really talking about with this instruction is that what the district court should have said was that the reasonable care on the part of a physician in an admiralty case involving medical malpractice, that it needed to be specific about what that circumstance was, as opposed to generally telling the jury that it's under, you know, all the circumstances and allowing that to be argued by counsel based on the evidence. That seems to me entirely within the district court's discretion. Your Honor, I disagree that it's entirely within the district court's discretion because I believe that the district court with respect to this decision court's decision in Franza stopped short of giving the district judges the guidance that I believe they need in order to go to the step further of not only in the context of examining the jury instruction, although I think that's what we said in France is indisputable cruise lines must treat their passengers with ordinary reasonable care under the circumstances. It seems to me this instruction is exactly what we what we said in France. Your Honor, the problem also is that Franza admittedly in dicta also talked about the fact that it would be inappropriate to expect the same standard of care. Find the exact language implicit in this Bible standard is the notion that cruise lines will not always be held to the same standard of care that would guide treatment on short, that's not to say that they can't sometimes be, they won't always be. Your Honor, in front of this court also said there can be no dispute that a cruise ship is different from a hospital. Undeniably the practice of medicine is far more central to hospital operations into the business of cruising a shift like a university medical center offers an abbreviated menu of treatment and procedure options as compared to a hospital or private physician's office, which is, which was, which was the burden of you and your expert to explain to the jury. Right. Your Honor, they're not, they're not going to jump up and say wait a minute, that wasn't a circumstance in this case it really took place in the harbor on shore. Your Honor, I don't think that that was our burden, I believe, with respect to the plaintiff has the burden of coming in and demonstrating what is the appropriate standard of care, and whether or not it was met or not met in this case. And if you look at the expert's testimony. Go ahead, sir. He did. And then you're to come in and say no, no, that's not the standard of care because of X, Y, and Z. And we know we argued that this was equivalent to emergency room but don't pay any attention to that. Your Honor, Dr. Mijano plaintiff's expert testified, this was below the standard of care in every way, not just as a cardiologist, but also someone who works closely with emergency room physicians. Like I said before, this decision is something that emergency room physicians do every day. That's at the record 169 at page 159. Tell nicely with the testimony that this was the equivalent of an emergency room at sea. It's your client offer. Your Honor, it's a state of the art facility, but there are practical limitations. He didn't say state of the art facility did he I thought he said it was equivalent to emergency room. Your Honor. He may have done so either did or didn't I, Your Honor, he, it is absolutely, I don't recall if he used the functional words that it's called equivalent I don't recall, but I will acknowledge that it is equivalent but there are differences between an equivalent emergency room that doesn't have a surgical center to deal with an emergency hemorrhagic brain bleed, and a land based emergency room that theoretically could and when doctors normal Rosa and I'll meet a described the decision they have to make it was defined within the contours of the fact that they didn't know when the Mr. Even Judge Huck referred to this as his words a quote nice clean appellate issue unquote, because he recognized the fact that we were looking at dicta and Franza, but I think Judge Huck acknowledge and recognize that there was some uncertainty. When looking at the dicta I leave that was my impression, but Judge Huck referred to it as a quote nice clean appellate issue unquote, my time is up, unless there are any questions that I can answer I appreciate it and we asked that they the court, a firm on the Yes. Thank you, and I'll briefly touch on the cross appeal it is appear to me that it requires a lot of attention but just prior you're absolutely correct in France a judge Marcus relied upon the current standard which is exactly the standard that the jury was instructed on reasonable care circumstances, their instruction just wanted to say on a boat a few times. And I think you've put your finger on that. I'd also point out that they're trying to think you might get the idea that I think Judge Huck did a good job all the way around. I am getting that feeling, Sam. Now, let me get to the point where in regardless of how he will respect to our economists who really did nothing but crunch numbers, like all economists do agree with that. The. I draw the court's attention back to its case to its authority and Davis versus Walmart stores there. In that case, this court held that basically all they did was indicate that he had he could produce less for the company. In fact, in that case, the individual was making more because of share of profits. But this court held under Florida law trial court should instruct the jury on future loss of earning capacity. When there is evidence of a permanent injury, and then in nebula glass. This court went on to note that it's not a specific number, and not a certainty, but the amount of the amount of damages must be established with reasonable not absolute certainty, it is sufficient if a reasonable basis for computation of damages is afforded, even though the result will only be proxy. There's no. The other side is like no case law, and I've done a case where it says you absolutely have to say, this is the specific job I can obtain and this is the specific amount of money I can earn you look at all the factors in the law, all the, all the surroundings, things in a jury decides. Can he, can you do that can you do more or can they could have awarded the hundred and 35 minus the eight that the jury could have done that under the facts in this case so whether or not we have an expert economist and I might have been just the problem here is about 135 that would have been a nice neat issue that could have been wrapped up a trial is he quit the job because he couldn't do it for factors related to cardio. Every other time health to with stress. You know if this had happened six months earlier. Different case, we wouldn't be here. Well, that's the problem you can't pick hundred and 35,000, because that was a job that we know in the record, he couldn't continue doing. I have to take issue with that there is no evidence that he could not continue there's evidence that he chose not to continue that he wanted to develop the two properties he had, there's, there's no evidence that he failed at the two properties. If he didn't have this heart attack, didn't have the failure to treat it. There's no evidence that he couldn't have gone back and gotten that same job. I thought his physician recommended to him that he not continue in that high stress position am I wrong about that you yes you are wrong that was the advice. After what happens on the ship after the negligence that the jury found. So he did not quit the first job there's not a scintilla of evidence in this record that the reason he quit the first job was stressed. Well, he, he may have said at some point that it was a stressful job but but he the reason he quit it was so he could go do this other thing. But even if even if that's the case, he would, he still had the ability to do the job even doing that type of job for 15 years, the fact that he decided, I'm going to go in a different direction right now doesn't mean that he didn't have that capacity. Mr. It seems to me part of the problem here is, you know, you talked about having say, say, a vocational expert or something like that. If, if a physician had testified. Not only do I not want him to return to the 60 hour a week job as a CEO. That would be endangering his health, far too much. But he really is not capable of working more than even 40 hours a week in a lower stress job, like serving on a corporate board or university teaching we'd be we'd have a different case. No, we don't have that case, all we have is after after the medical expert says he can't return to his old job, medical expert doesn't testify as to what his post injury earning capacity is, we have his own assessment of what he, he wants and plans to do. But that's not the same thing. Well, we have medical testimony that he cannot have a full time job. I believe that Dr Ramper said testify that he should, he should try seeing if you work four or six hours a day but and we have the testimony. The button case we cited to judge how we don't even have to have an expert say, you know, at all, the plaintiff can testify to what is his health is what his surroundings are, what is capacity is, and a jury takes all of that, and it comes up with an admittedly perhaps imprecise number but that's what the case law says it doesn't have nebula glass is it doesn't have to be exact, it just has to be approximate, and there's a reasonable certainty. Okay, but, but, but the most important factor there is that there's a person, a permanent and I think we understand the issue Mr. Parrish on your, your time is has expired and we appreciate your argument this morning. Both of you.